**Samuel HAWKINS,**

v.

**The STATE of Texas, Appellee.**

No. 62534.

Court of Criminal Appeals of Texas, En Banc.

Jan. 14, 1981.

Appellant's Amicus Curiae Rehearing Denied Feb. 4, 1981.

Samuel Hawkins, pro se.

Selden Hale, Amarillo, court appointed, for appellant.

Thomas Curtis, Dist. Atty., John Byron Reese, Asst. Dist. Atty., Amarillo, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION ON STATE'S MOTION FOR REHEARING

CLINTON, Judge.

Our opinion on original submission is withdrawn. In it, responsive to contentions made in an amicus curiae brief, the Court reversed the judgment of conviction and remanded the cause for a new trial on the twin conclusions that neither the standard for waiver of counsel nor the standard for self-representation were satisfied in the trial court. This the Court was authorized to do in the interest of justice by Article 40.09, § 13, V.A.C.C.P.

The opinion and judgment of the Court have at once received support and have come under heavy attack, according to the lights of respective interested parties. But none is more vehement than appellant, who is undertaking to represent himself on this appeal.[1] In his "motion and answer" to the State's motion for rehearing, appellant expressly agrees that rehearing should be granted and insists that the Court "reverse its decision and rehear this case in full compliance with Article 40.09 C.C.P. and rule on the pro se brief" on the merits of his appeal.[2] Indeed, in another response appellant asserts that by not considering the grounds of error in his pro se brief according to Article 37.071,[3] V.A.C.C.P., we are denying him due process of law.

The Court is thus confronted with a demand that rehearing be granted by an appellant whose exercise of self-representation beginning in September 1978 has been seriously questioned. However, those questions and the conclusions reached on original submission are based on a record of proceedings that were held more than two years ago. We judicially know that on or about October 1, 1980, after the opinion in this case on original submission, this Court granted a motion of appellant for leave to proceed pro se in our Cause No. 65,000[4] after a hearing in the trial court, ordered by the Court for that purpose, established

---

1. We note that immediately after the verdict of the jury on punishment was received and the trial court pronounced judgment, the court offered to have court-appointed trial counsel handle the appeal or assist appellant in doing so, but was told by appellant:

 "I would, Judge, as I have indicated earlier, I would like to file my own appeal."

 The trial court responded, "That will be fine." See, in this regard, *Webb v. State*, 533 S.W.2d 780, 786 (Tex.Cr.App.1976).

2. In that answer appellant informs us that he did not know the amicus curiae intended to argue any grounds of error other than the seventeen raised by him in this pro se brief; in effect, appellant disavows the contentions advanced by amicus curiae that were addressed on original submission.

3. His reference is to (f) of Article 37.071, supra, which provides for automatic review by this Court of every judgment of conviction and sentence of death.

4. Also a capital murder case pending on appeal, the parties are the same—albeit a different District Attorney—and to the extent that the matter of self-representation on appeal has been resolved we deem it a related proceeding for purposes of judicial notice. *Ex parte Paprskar*, 573 S.W.2d 525, 527, n. 1 (Tex.Cr.App. 1978); *Ex parte Flores*, 537 S.W.2d 458, 460, n. 3 (Tex.Cr.App.1976); *Huffman v. State*, 479 S.W.2d 62, 68 (Tex.Cr.App.1972).

conclusively that appellant is well advised as to his right to counsel and the dangers and disadvantages of self-representation, and knowingly and intelligently waived the right and insisted on risking the potential detriment of representing himself.[5] So, applying the rationale of *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), as was done in *Webb v. State*, 533 S.W.2d 780, 784 (Tex.Cr.App.1976), we are satisfied that before this Court appellant has effectively asserted his right to self-representation on appeal in this cause.

■■■ What is presented, then, are a State's motion for rehearing asserting that the findings and conclusions of the Court are erroneous and an appellant's motion and answer *in propria persona* that, in effect, concedes the errors asserted by the State. A confession of error by the State, though uncommon, is ordinarily accepted, e. g., *Miller v. State*, 460 S.W.2d 427 (Tex.Cr. App.1970); *Arsiaga v. State*, 372 S.W.2d 538 (Tex.Cr.App.1963); *Crain v. State*, 253 S.W.2d 867 (Tex.Cr.App.1953); *Ramiriz v.*

*State*, 155 Tex.Cr.R. 206, 233 S.W.2d 307 (1950); *Anderson v. State*, 154 Tex.Cr.R. 372, 227 S.W.2d 815 (1950), and there would appear to be no impediment to an appellant's doing the same, if so advised. Certainly, an appellant may deliberately waive possible grounds of error simply by not asserting them in his appellate brief, cf. Article 40.09, § 9,[6] or by failing to brief one that is assigned, e. g., *Williams v. State*, 504 S.W.2d 477 (Tex.Cr.App.1974). It occurs to us that an appellant may still agree with the State that a certain issue is, or is not, in the case, *Downes v. State*, 22 Tex.App. 393, 3 S.W. 242, 243 [7] (1886), and do so effectively by asserting his agreement in a pro se pleading.

■■■ Accordingly the State's motion for rehearing is granted, and we shall now address such of appellant's seventeen grounds of error as may be required.[8] In a cluster are grounds raising questions about the soundness and reliability of certain psychiatric testimony, but the one that concerns

---

5. In sum appellant testified that he did not want the lawyers appointed to represent him on appeal to do so; that he did not want any lawyer to represent him on appeal; that he did not want a lawyer to assist him on a stand-by basis; that he wanted the briefs filed by his appointed lawyers to be stricken; that he knew under the Sixth Amendment he had the right to effective assistance of counsel and that he wished to waive that right; that he is a 36 year old, high school graduate; that he has represented himself in an aggravated rape case tried in Harris County and in the instant capital murder case tried in Travis County; that if his time in court on all three of these cases were added up, the total would be about ten weeks; that during these trials he filed pretrial motions, made objections, etc., at trial, filed motions for new trial, and filed briefs; that he knew the appellate procedure set forth in Article 40.09 (and he recited it accurately); that he has a Code of Criminal Procedure and a Penal Code and has access at all times to law books at T.D.C.; that he has never been declared insane or incompetent by any court and he makes no claim that he is insane or incompetent now; that no one has threatened or persuaded him to represent himself; that he is aware of the dangers and disadvantages of representing himself, but voluntarily chooses to represent himself even if it is to his own detriment; that he knows how to prepare a brief (and he explained how he would point out the errors in the record, cite his authorities and

make his arguments); and that he was aware that he might make a mistake which would later harm him if he went into federal court (such as inadvertently waiving some point).

6. The brief of appellant shall "set forth separately each ground of error of which the defendant *desires* to complain on appeal..." (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

7. "This case was submitted to us upon a single question, by an agreement in writing signed by counsel for both parties, and by said agreement all other questions that might arise in the case were expressly waived. * * * We decline to consider and determine this [other] question, in view of the aforesaid agreement of the parties..."

8. While appellant has a right to have the Court consider every ground of error properly raised by him, he is not entitled to a discussion of each question in the written opinion of the Court. *Fox v. State*, 145 Tex.Cr.R. 71, 165 S.W.2d 733, 734 (1942). Article 44.24, V.A.C. C.P., only requires that the opinion set forth "the reason for such decision" in the case. *Lindsey v. State*, 608 S.W.2d 230 (Tex.Cr.App., 1980, Motion for Leave to File denied December 23, 1980).

us most is his ground of error number nine. It reads: "Court erred when overruling Appellant's objection to the State witness Dr. Grigson." This broad assertion must be put in perspective.

The offense in the case at bar is alleged to have occurred February 3, 1976. Appellant was arrested the morning of June 30, 1977, and held without bail.[9] Indictment was returned July 28, 1977.[10] August 8, 1977, on motion of appellant through court-appointed attorney, the trial court ordered Dr. Hugh A. Pennal, an Amarillo psychiatrist, "to determine the mental competency" of appellant to stand trial. Reports from Dr. Pennal to the trial court are dated December 29, 1977,[11] January 31, 1978 [12] and February 8, 1978.[13] In June 1978 appellant filed a pro se motion for hearing on his competency to stand trial, and on October 3 gave written notice that the issue of insanity at the time of the offense may be raised in the case. At a pretrial hearing October 12, 1978 appellant announced his waiver of proceeding on the competency motion but the cautious trial court permitted the prosecutor to develop testimony from Dr. Pennal that in his opinion appellant was completely competent to stand trial. At the conclusion of the hearing the trial court ruled that "there is no evidence to support a finding of incompetency," and followed that oral pronouncement with a written order dated October 17, 1978, denying a jury determination of the matter. Thus, more than a month before the trial began that present competency was not an issue in the case was clearly ruled and understood.[14]

■ As made clear in the opinion on original submission, the matter of appellant representing himself came up several times before a patient trial judge, and finally that right was accorded to him, to be exercised with or without assistance of a court-appointed "standby" attorney as appellant desired. November 27, 1978 the case was called for trial,[15] and after it had been

9. In his ground of error sixteen appellant asserts the State did not prove probable cause for his warrantless arrest but, though appellant touched on it in questioning Detective Bill Eaton during a pretrial hearing on motion to suppress his confession, our search of the record does not reveal that the matter was ever made an issue in the case. Indeed, the witness we understand was the senior arresting officer, Lt. Darrell Garner, was not asked a single question about the arrest. Nothing is presented for review.

10. Appellant complains in his second ground of error that the State did not serve notice that it would seek the death penalty, but he relies on the former provisions of Article 1.14, V.A.C. C.P. that have been legislatively removed. See *Batten v. State*, 533 S.W.2d 788, 793 (Tex.Cr. App.1976).

11. Dr. Pennal recounts the "rather extensive work-up" and states that his conclusion is that appellant "represents, as a diagnostic entity, a classic case of true paranoia."

12. After completing additional study, Dr. Pennal reports that appellant is competent to stand trial, was not psychotic at the time of the offense and was then sane.

13. This last report explains the use of the term "paranoia." His first report was meant to connote "extreme suspiciousness," and goes on to note that his additional study reveals that "many sociopathic traits are present."

14. Later that understanding was underscored when in presenting his insanity defense appellant posed a question to a psychologist who had examined him and the following occurred:

"Q: Okay, in your opinion, Dr. Wall, am I suffering from a mental disease now?

(District Attorney) It's not a matter at issue, Your Honor. That matter at issue is whether he was suffering from a mental disease or the appropriate issue is whether or not he was legally insane back on February the 3rd, 1976.

THE COURT: I sustain the objection."

15. Venue for trial of the case had been transferred from Potter County to Travis County. Before announcing ready for trial appellant made an oral motion for appointment of a Travis County practitioner to assist in jury selection. Ascertaining that appellant was still insisting on representing himself and with appointed "standby" counsel present, the trial court denied the motion. By ground of error five appellant asserts error in this, citing cases that hold appointment of counsel is required at every stage of a criminal proceeding where substantial rights might be affected. However, appellant had waived his right to counsel, and the refusal of the trial court to grant a form of hybrid representation was not error. See *Landers v. State*, 550 S.W.2d 272, 278 (Tex.Cr.App. 1977); *DeRusse v. State*, 579 S.W.2d 224, 237 (Tex.Cr.App.1979).

assembled the trial court propounded to the panel of prospective jurors what was characterized as "certain principles of law applicable to this case." *Inter alia*, the trial court alluded to the fact that appellant was representing himself, outlined the law in that respect, mentioned admonishments given appellant and concluded by instructing the panel:

"You will not consider the Defendant's having elected to act as his own trial Counsel as any evidence for or against the Defendant or the State in this trial." [16]

Each juror who was ultimately selected was thoroughly qualified by the prosecuting

attorney on the matter of appellant representing himself.[17] Appellant often followed up with one or two questions on the point.[18]

Before the State commenced to present its case, then, two ground rules for conduct of the trial were explicit: one, present competency of appellant was not at issue and, two, the fact that appellant was representing himself was not a matter for jury consideration.

The State called its first witness December 4, 1978. He and the others presented by the State during its case in chief testified to certain facts surrounding the offense as well as the subsequent arrest of

16. Immediately preceding the quoted instruction the jury had been told:

"Defendant representing self. You should know that the Defendant in this case has chosen voluntarily to act as his own Defense Attorney and Mr. Seldon Hale, a practicing attorney in Amarillo, Texas, has been appointed by me to remain standing by during the trial in the event that the Defendant at some point decides to change his election to act as his own Counsel and to exercise his right to be represented by Counsel appointed for him.

It is the law that a person on trial has the right to an appointed lawyer if he is indigent, but it is also the right of the person on trial to act as his own Counsel if he insists on doing so, as the Defendant, Samuel Hawkins, has insisted in this case. His election to do so was voluntarily made after I had admonished him that he would have to observe the same rules of evidence, procedure and law that a licensed attorney acting as a trial counsel would have to observe. And I may necessarily in the course of the trial make legal rulings holding him to these legal standards despite his lack of formal legal training."

17. Examination of the juror first accepted, Susan Cavazos, is typical:

"Q: Now, as the Judge told you when you were here as a group earlier this morning, the Defendant in this case is named Sam Hawkins, he is seated to my left. And he has insisted on his right, and he has an absolute Constitutional right, to represent himself as his own Counsel in this trial. And as the Judge told you this morning, he has a right to do that.

A Lawyer has been appointed, that is seated there by him, to stand by and give any advice that is asked for.

Do you have any disagreement with the law that permits a Defendant to represent himself if he insists on it?

A: No, sir.

Q: You think that law is a good law and all right—

A: If he wants to, that's his business.

Q: Okay. Now, during the course of the trial I may make an objection from time to time or I may respond to some objection that the Defendant might make on his own behalf. And you heard the Judge, this morning, tell you that he was going to hold the Defendant to the rules of evidence and courtroom procedure just as though he were a licensed lawyer, and he would have to follow those rules.

Do you have any disagreement with that, do you think that's a fair enough thing if he is going to represent himself?

A: That's fair.

Q: It really, Miss Cavazos, it kind of worries me, because being a licensed myself [sic], I'm afraid that you or anybody else on the jury might think I'm bullying him because—I mean, I guess he can't help not having a law license, but I can't help having one as we sit here today. Would you hold that against me or against the State that I represent—

A: No, sir, he had an opportunity to get a lawyer and he still can.

Q: And you wouldn't hold it against me, the fact that I do have some legal training, while he does not have any formal legal training?

A: No, sir."

18. Thus he asked Cavazos whether the fact that he was representing himself affected her in any way; when she asked for amplification, the question and her answer were:

"Q: Would it make you think I'm committing a stupid act, and agree with the District Attorney that I should be found guilty because of that?

A: No, sir."

and statement by appellant concerning it, the final witness being a pathologist who gave his opinion as to the cause of death of the victim.

In presenting his defense, appellant testified [19] and then [20] called Richard Lee Wall, PhD, a Clinical Psychologist, who had interviewed and tested him January 16 and 17, 1978. His initial diagnosis was paranoia, but about three weeks later, after assaying other information, Dr. Wall changed it from paranoia to the less severe "paranoid condition." [21] At the end of Dr. Wall's testimony appellant rested his case.

Dr. Grigson was called by the State as its first rebuttal witness.[22] Ground of error number nine, though inartfully drawn, is clarified by a paraphrase of portions of the record that are specifically cited, viz:

"Q: Would you tell the Jury your impression of that document which was delivered to a clinical psychologist named Dr. Wall in connection with his examination of the Defendant?

A: Yes. This is—if you read it, you find that this is an absolute manipulation on Mr. Hawkins' part, to say, 'See, I must be sick, something is wrong with me.'

Now, what he is doing, as most sociopaths will do, they will make minor concessions such as he doesn't mind telling you about his horrible sexual drive and all of the terrible things which he has done, but what he hopes to gain from this is a major concession.

The con job is, 'You have got to see how crazy I am and how sick I am. You can't consider finding me guilty because of what I am.'

But this is simply manipulation on his part.

MR. HAWKINS: Judge, I object to Dr. Grigson's opinion because he only saw that for a few minutes ago (sic).

And as I shared with the Court earlier, I had a subpoena form to back up everything that is in there, and the State and the Court were the ones that refused the subpoena form which I have here to prove these situations.

So Dr. Grigson doesn't have the authority to say this isn't true.

THE COURT: I will overrule your objection.

You can proceed.

Q: (By Mr. Curtis) Doctor, as you observed the Defendant just at that time, was he displaying some evidence of anxiety as he stood up and made that objection?

A: Well, he, one, is trying to get attention and play like an attorney. This feeds his ego.

MR. HAWKINS: Judge, I still object to Dr. Grigson's opinion as to what feeds my ego. He should deal with the examination on this case, Judge, with reference to the evaluation which he took of me, and that's the context of his testimony (sic).

THE COURT: I will overrule your objection."

Dr. Grigson had examined appellant only one time—January 13, 1978, in the Potter County Jail. Our search of the record for

---

19. Recounting a long history of the consequences of what he termed "an uncontrollable sex drive," appellant recalled earlier efforts at "therapy" in another state. On cross examination at first he made no answer to a question as to whether he had a mental disease but, upon being prodded, he gave a rambling reply that ended with his characterizing that "drive" as a mental defect.

20. Appellant put an Amarillo television newsman on the stand to have him testify to a series of interviews he had with appellant that were later broadcast, but on objection by the State the trial court ruled out the proposed testimony; we find no error in that ruling.

21. Dr. Wall told the jury, on cross examination, that he did not know whether appellant was psychotic on February 3, 1976, and that he had "no way of knowing" whether the condition he diagnosed "could reasonably be expected to have changed" between the time of his examination and "the present time."

22. In view of appellant's equivocation, note 16, ante, since Dr. Wall disclaimed any opinion about appellant's mental condition at the time of the instant offense, see note 18, ante, there really was not much to rebut.

his authority to make the examination has produced none, but apparently it was in connection with yet another case pending against appellant in Hutchinson County. We have already observed that during this contemporaneous period appellant was being tested, examined and evaluated by Dr. Pennal through appointment by the trial court.

Dr. Grigson testified that he conducted a mental status examination of appellant, describing to the jury its five parts, and that he came to his now familiar diagnosis of sociopathic personality disorder.[23] He expressed the opinion that appellant was not suffering from a mental illness or disease either at the time of the examination or anytime prior to it. After elaborating on characteristics he finds in the sociopathic personality, he described appellant as manipulative, then was presented Defendant's Exhibit 1 and gave testimony over objections that appellant cites in support of his ground of error and we have set out *ante*.

As Dr. Grigson was presenting his views and opinions on direct examination appellant made no objection until Dr. Grigson stated his "impression" of the Defendant's Exhibit 1. When that objection was overruled the District Attorney then pointed out to Dr. Grigson to what appellant, acting as his own attorney, had just done: "Doctor, as you observed the Defendant just at that time ... as he stood up and made that objection ..." Thus prompted, Dr. Grig-

son undertook to inform the jury that appellant "is trying to get attention and play like an attorney" for it "feeds his ego."

■ Appellant now asserts, "Yet the court allowed the State's witness to do the very thing he told the jury not to do," and contends admitting the testimony violated his rights under the Sixth Amendment [24] to the Constitution of the United States, Article I, § 10 [25] of the Constitution of the State of Texas and Article 1.05,[26] V.A.C.C.P.

"... The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.' *Illinois v. Allen*, 397 U.S. 337, 350–351 [90 S.Ct. 1057, 1064, 25 L.Ed.2d 353] (Brennan, J., concurring)."

Thus wrote the Supreme Court in *Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975). We believe neither the State nor Dr. Grigson honored appellant's personal choice to represent himself. Rather, they denigrated his decision and mocked him for making and carrying it out, and in the doing weakened the carefully structured protection that until that moment had been accorded the consti-

---

**23.** See, e. g., *Smith v. State*, 540 S.W.2d 693, 696 (Tex.Cr.App.1976), *certiorari denied* 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977); habeas corpus relief granted in *Smith v. Estelle*, 445 F.Supp. 647 (ND Tex. 1977) *affirmed* 602 F.2d 694 (1979) certiorari granted, cause argued, decision pending; *Livingston v. State*, 542 S.W.2d 655, 661 (Tex.Cr.App.1976); *Moore v. State*, 542 S.W.2d 664, 676 (Tex.Cr.App. 1976); *Gholson v. State*, 542 S.W.2d 395, 399–401 (Tex.Cr.App.1976); *Chambers v. State*, 568 S.W.2d 313, 325–326 (Tex.Cr.App.1978); see generally, "Witness for the Prosecution," *DMagazine*, June 1980, 131 ff.

**24.** The Sixth Amendment provides the right of an accused to be informed of the accusation against him, to be confronted with witnesses, to have compulsory process to obtain witnesses and to have assistance of counsel "for his

defense." From this is derived the correlative independent constitutional right to defend himself. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Brignon v. State*, 399 S.W.2d 810, 812 (Tex.Cr.App.1966).

**25.** In pertinent part § 10 of our Bill of Rights provides that an accused "shall have the right of being heard by himself or by counsel, or both." However, the language is not to be taken literally, as *Landers v. State*, 550 S.W.2d 272, 275 ff (Tex.Cr.App.1977), teaches; see also *Phillips v. State*, 604 S.W.2d 904, 907 (Tex.Cr. App.1979).

**26.** Like § 10 of the Bill of Rights, Article 1.05 also speaks of "the right of being heard by himself, or counsel, or both," but see note 25, *ante*.

tutional right of appellant to conduct his own defense.

It is plain that the preliminary instructions given by the trial court in this respect to the panel of prospective jurors, pursuant to Article 35.17, V.A.C.C.P., were intended and designed to present appellant in that capacity and protect both the accused and the State from any adverse inferences being drawn from the fact that appellant was representing himself. Just as the panel was told they were not to consider his failure to testify should that be his election,[27] so also they were not to consider his having elected to act as his own trial counsel for or against appellant or the State "in this trial." The questions by the State and the answers by Dr. Grigson thus put before the jury the very matter they had been instructed by the trial court they were not to consider, and had been excluded on objection by the State when appellant broached the subject with Dr. Wall, see note 14 ante.

Years ago in *Waters v. State*, 91 Tex. Cr.R. 592, 241 S.W. 496, 499 (1922) it was written:

"... The trial of causes involving life and liberty to the citizen, whatever may be his standing or estate, whether he be of high or low degree, the procedure and result involve the most serious matters. Such trials are not to be made mere opportunities for verbal sword-play between competing counsel, nor should the fair judgment of the jury be affected or influenced by aught save the consideration of the testimony and its effect, under the law as presented."

█ Certainly in this State self-representation is not new, *Webb v. State*, 533 S.W.2d 780, 783 (Tex.Cr.App.1976), and from considerations that have caused the Court to deny a right to "hybrid representa-

tion," *Landers v. State*, supra, at 278, *Phillips v. State*, 604 S.W.2d 904, 907 (Tex.Cr. App.1979), *Webb v. State*, supra, at 784, and to require the trial judge to make an accused fully aware that "he will be on his own in a complex area where experience and professional training are greatly desired," *Trevino v. State*, 555 S.W.2d 750, 751 (Tex.Cr.App.1977), and that "he will not be granted any special consideration because of his lack of formal training in law," *Geeslin v. State*, 600 S.W.2d 309, 314 (Tex.Cr. App.1980), it follows that though not an attorney an accused is expected to conduct himself like one to the extent of his ability to do so.

█ In *Williams v. State*, 549 S.W.2d 183, 189 (Tex.Cr.App.1977), following *Faretta v. California*, supra, at n. 46,[28] the Court stated, "When an accused elects to represent himself he cannot complain that the quality of his own defense amounted to a denial of effective assistance of counsel." Also, the Court has observed that a selfdefending accused "has no right to ask for a reversal because he alienated the jury while doing so," *Rasberry v. State*, 535 S.W.2d 871, 873 (Tex.Cr.App.1976). However, neither the Supreme Court nor this Court has ever indicated that an accused who is exercising his independent constitutional right to represent himself is fair game for the State and its witnesses. Indeed, if the right is to have any practical meaning, its actual exercise must be honored "out of 'that respect for the individual which is the lifeblood of the law' " as much as the initial decision. Making sport of appellant for voicing the very first objection to testimony of Dr. Grigson is the antithesis of deference to the determination by an accused to represent himself demanded by the Supreme

27. And, of course, it is a well settled constitutional principle by judicial decision and implemented by statutory law that the failure of an accused to testify in his own behalf shall not be taken as a circumstance against him, "nor shall the same be alluded to or commented on by counsel in the cause," Article 38.08, V.A.C.C.P. See *Stafford v. State*, 125 Tex.Cr.R. 177, 67 S.W.2d 287 (1934).

28. "The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules or procedural and substantive law. Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel'."

Court of the United States in *Faretta*. Such an accused is entitled to give his best effort to be effective counsel for himself without demeaning characterizations or innuendos that would or should not be permitted against a licensed trial counsel. *Cook v. State*, 537 S.W.2d 258, 261 (Tex.Cr. App.1976) and cases cited therein; see *Ford v. State*, 166 Tex.Cr.R. 347, 314 S.W.2d 101, 102 (1958): "Lawsuits should be tried upon the issues raised and submitted to the jury and not upon collateral issues such as personal conflicts between counsel." [29] As the Court remarked in *Franklin v. State*, 41 Tex.Cr.R. 21, 51 S.W. 951 (1899):

"... We would observe here that counsel has a right at all times during the progress of the case, in proper manner, to reserve a bill of exceptions to any action of the court or counsel deemed improper, and he has a right at all times in taking his bill of exceptions to be treated in a respectful manner. No doubt the purpose of the district attorney was to belittle his exception. This course of practice should not be allowed." [30]

▉ Accordingly, we hold that where competency to stand trial is not an issue and the accused is exercising his independent constitutional right to conduct his own defense it is error of constitutional dimension for the prosecutor or a witness to comment adversely concerning the mental attitude of the accused as he is exercising that right.

▉ Nevertheless, though the exchange between the prosecutor and Dr. Grigson and the adverse ruling by the trial court were erroneous and occurred in a capital case, the question remains whether the errors are harmless beyond a reasonable doubt. *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); [31] *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); [32] *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[33] That determination is for this Court in the first instance, *Foster v. California*, 394 U.S. 440, 444, 89 S.Ct. 1127, 1129, 22 L.Ed.2d 402 (1969), and we now turn to make it.

The bare bones of the case presented by the State are described in the opinion on original submission. Appellant "in essence admitted the commission of the offense" of killing a twelve year old girl during the course of kidnapping her from her home and thereafter attempting to, if not actually accomplishing, rape. As well as a confession produced by the State there was an abundance of circumstantial evidence that appellant did just what he said in his confession he did.[34]

---

**29.** This observation came in the context of finding reversible error in overruling objections to improper questions propounded by the prosecutor to defense counsel, whom he had called as a witness, "which were calculated to leave the impression with the jury that appellant's counsel had been guilty of some trick or device in the selection of the jury."

**30.** In *Waters v. State*, 91 Tex.Cr.R. 592, 241 S.W. 496, 499 (1922) the Court similarly urged that "there is no need for the attorneys for the people to resort to such methods" as the making of sidebar remarks and "to belittle the objections and complaints made on behalf of appellant."

**31.** A violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), was found harmless by the Supreme Court.

**32.** Overwhelming evidence of guilt may relegate constitutional error to condition of harmlessness. The error we now treat occurred, it is to be remembered, on rebuttal during the guilt-innocence phase of the trial.

**33.** In a "reasonably strong 'circumstantial web of evidence' against petitioners" in which "honest, fair-minded jurors might well have brought in not-guilty verdicts," a "machine-gun repetition of a denial of constitutional rights (prosecutorial comments on failure to testify), designed and calculated to make petitioner's version of the evidence worthless" cannot be considered harmless, 386 U.S. at 25–26, 87 S.Ct. at 828–29.

**34.** "... I just wanted to get her away from the house so she would'nt [sic] scream. She couldn't have seen the truck that I was in because I put a stocking over her eyes that I had taken out of the front room of the house. * * * I took her to my truck, and she got in. We then drove off. I got about three miles or so down the road and the girl started screaming and kicking. I tried to calm her down and when I couldn't I got excited. I noticed a piece

Also before Dr. Grigson gave his testimony, appellant, thoroughly cautioned and warned by the trial court that on material matters he was waiving his constitutional right against self-incrimination by taking the stand, did so and testified in narrative form at some length—spurning the option of having his "standby attorney" pose pertinent questions to him. Beginning with his early childhood, appellant related that his "sex drive" was strong, such that he masturbated so regularly that there were times when his penis became "raw or swollen twice its size." We allude to this earthy testimony of appellant since he regards such manifestation of his early "sex drive" as indicating the "mental defect" that continued to preclude selfcontrol of his sexual behavior toward others generally and certain victims particularly. The details of that continuing course of misbehavior we will pretermit; suffice to say that he narrated a history of juvenile indecency with his minor sisters and attempted buggery, followed by incidents as an adult of public lewdness, a rape in Denver, Colorado, an entry with intent to rape in Oklahoma City, Oklahoma, and "the same problems" for a year in Jacksonville, Florida—all prior to moving to the Amarillo area. There, appellant was, as he summed it up, "arrested on some 13 rapes... and two murders as a result of this sex drive which didn't ever change." Appellant concluded his personal presentation by summarizing his conversations with several Amarillo police officers and detectives, in which he "shared with them my problem," subsequently confessed to committing the instant offense and others, and bringing himself "to the point pretty much where I am now with this problem." On cross-examination appellant acknowledged that he had been convicted of the more particularized offenses he had re-

counted, and evasively conceded to killing the victim in the case at bar.

Appellant then called Dr. Wall and through him developed much of the same history, winding up the examination with introduction of a seven page handwritten account of the same history signed by appellant. It is Defendant's Exhibit 1, which when shown to Dr. Grigson for his "impression," gave rise to the disputed exchange.

■ Thus, the jury had before it appellant's own live testimony of his "problems," the history given Dr. Wall and a personally written report that appellant himself had prepared (for consideration by Dr. Wall in his examination) and on his own initiative introduced as an exhibit in presenting his defense. Not only is evidence of his guilt of the offense charged overwhelming, but also we must conclude "that the 'minds of an average jury' would not have found the State's case significantly less persuasive" had the testimony of Dr. Grigson as to appellant's "ego trip" in representing himself been excluded, *Schneble v. Florida*, supra, 405 U.S. at 432, 92 S.Ct. at 1060. Therefore, the ninth ground of error presents error that is harmless.

Ground of error one contends that his written confession was not voluntarily made by appellant, in that it is the product of unkept promises by his interrogators. The court conducted a far-ranging hearing on a pro se motion to suppress the confession, alleging *inter alia* that promises to obtain "mental help" for him caused appellant to begin to discuss his "problems" and several offenses he had committed and persuaded him to sign the written confession.

We note at the outset that the statement recounting the instant offense was but one of a trio of confessions to separate crimes purportedly made by appellant during the

---

of steel in the floor board of the truck. This piece of metal was about a 12 inch square. I picked the piece of steel up and hit the girl in the left side of the face. The girl fell over. When the girl fell over, I hit her again. I don't remember how many times I hit her but I kept hitting her with the piece of steel. The girls [sic] head was bleeding very much, so I got the pillow case off of a pillow that I had in the

truck, and I wrapped it over the girls [sic] head to keep the blood from getting on the seat. * * I came to a little gutter bridge in the road. I stopped the truck, and drug her out, and put her under the bridge. I then left her under the bridge and went back to my job. I knew that the girl was dead when I hit her the first time because she fell over and didn't move...."

morning of July 1, 1977, the day following his arrest. This statement, as well as the other two, reads just above his signature, "I am giving this statement to Det. LaFavers of the Amarillo Police Dept. without any threats or promises given to me by him or anyone else of that Dept. I have read the above statement and it is true and correct to the best of my knowledge." Detective LaFavers testified that, in the presence of and with the assistance of two other officers, he interviewed appellant for some three hours before the first statement, the one in this case, was typed by him and read and signed by appellant; during that period of time, according to LaFavers, appellant appeared to be acting voluntarily, no threats or promises were made and there was no force of any sort used against him during the interview. The interview, or at least portions of it, were recorded and in our record are three substantially similar but still strikingly different transcriptions of the recording.[35] Before being confronted with any of them, LaFavers dissembled with respect to whether he had made certain statements that appellant translated into "promises," [36] but he did generalize his own thoughts concerning them, *viz*:

"My intention was not to promise you anything at that time, I don't feel as if it came across that way, . . . I didn't at the time feel and I don't now feel that you interpreted it that way."

The trial court heard the testimony, indicated that the transcriptions had been read, reviewed and compared and apparently agreed with LaFavers, for it pronounced the finding that "beyond a reasonable doubt the confessions which were introduced were voluntarily made." Subsequently, the oral ruling was reduced to written particularized findings and conclusions, two of which are:

"The defendant. . . was not coerced into making any of the said statements by any force, threats, persuasion, or promises or any other improper influence.

The statements given were reduced to writing; the defendant read them completely and signed them of his free will."

However much appellant disputed the testimonial and documentary evidence that support those findings,[37] the trial court "is the

---

**35.** Two begin identically with appellant saying, "I was probably about 9 or 10 years old," whereas the one proffered by appellant has him adverting to earlier remarks: "I was talking about, a minute or two minutes ago, my daddy. . ." The recording machine was being operated by Captain of Detectives E. N. Smith who, though testifying to related matters, recounted little of what preceded the opening remarks of appellant. Elsewhere it appears that appellant had been questioned unsuccessfully by other officers throughout the afternoon and evening of the day of his arrest. At about 11:00 p. m. Deputy Sheriff Isaiah Garrett, a black like appellant, visited with him alone. Being cross-examined by appellant, Garrett denied telling appellant that he had a sickness and "we're going to put you in the hospital." Rather, Garrett testified, he told appellant, "You have a problem," without characterizing it, and "You need to tell the truth and get this over with." (When Captain Smith testified before the jury, he answered affirmatively when asked by appellant, "Do you remember that the suggestion to give the confession was to Sergeant Garrett?") Presumably Garrett then summoned the other officers, the recording device was then turned on and appellant began a monologue covering two pages of the transcription before being interrupted by LaFavers.

**36.** Drawing from a transcription of the recorded interview in his possession, appellant cross-examined LaFavers about making such statements as "It [appellant's sex drive] is something that you yourself can't hold yourself at fault for, it is something that we will help you with, we will do that," "[W]e recognize the fact that you need help, and you are seeking that help now, psychological and psychiatric help, and I think the Courts will recognize that fact" and "You have the opportunity to help a lot of other people. So I think you are making the right choice, you're relieving yourself and you're relieving a lot of people. . ." These statements do appear to have been made, but the questions posed them completely out of context.

**37.** Appellant's attitude, reflected by his own testimony, is that he was "dealing with people that were tricking me, that were lying to me, that were deceiving me, promising me help when their sole intention was to file capital murder on me and give me the death penalty," while he was "trying . . . to get the help I need." As we read the transcriptions, they simply do not support that position. Before his monologue was interrupted by LaFavers, according to the defense version of the recording, appellant had already moved from his child-

sole judge of the weight and credibility of the witnesses," *Harville v. State*, 591 S.W.2d 864, 867 (Tex.Cr.App.1979), and, believing or disbelieving all or any part of the testimony of any witness, *Hughes v. State*, 562 S.W.2d 857, 863 (Tex.Cr.App.1978), resultant findings of the trial judge will be upheld if supported by the evidence, *Myre v. State*, 545 S.W.2d 820, 824 (Tex.Cr.App. 1977).

There is ample evidence to support the findings of the trial court.[38] We adhere to the settled rule that a confession must be free and voluntary and is not to be "obtained by any direct or implied promises however slight, nor by the exertion of any improper influence," *Roberts v. State*, 545 S.W.2d 157, 161 (Tex.Cr.App.1977). Still, even if, contrary to the usual procedure on review, the various statements made by LaFavers are viewed in a light most favorable to *appellant*, they do not constitute promises to obtain "mental help" in exchange for a confession. So far as this record shows, it was appellant who first introduced to his *interrogators* a long history of abnormal sexual behavior to account for his most recent persistently bizarre misbehavior and

violent criminal acts and conduct. Naturally LaFavers and the other officers professed understanding and empathy when appellant expressed so much self-concern that he "didn't want to live that way any longer and I still don't"—not to promise anything but to get to the point of the interrogation.[39] In the circumstances of this case, we find that kind of role-playing was neither improper nor did it induce or persuade appellant to confess his guilt. See *Roberts v. State*, supra, at 161. Thus, we further conclude that the evidence supports the two findings of the trial court, excerpted *ante*, and overrule ground of error one. *Harville v. State*, 591 S.W.2d 864, 867 (Tex. Cr.App.1979); *Burks v. State*, 583 S.W.2d 389, 393 (Tex.Cr.App.1979); *Hammett v. State*, 578 S.W.2d 699, 711–712 (Tex.Cr.App. 1979); *Hughes v. State*, 562 S.W.2d 857, 863 (Tex.Cr.App.1978).

Grounds of error eleven and twelve assert, respectively, that the trial court allowed the State to suppress evidence favorable to appellant and that assessment of the death penalty is contrary to law. However, his real complaints concern

hood problems through his inability to satisfy his wife to admitting the rape in Denver and an attempted rape, concluding, "Sometimes I would leave home with good intentions, but some force would turn me around. For the last two weeks or so ... I didn't want to live that way any longer and I still don't." Then LaFavers made sympathetic remarks, including the willingness to try to help with the problem, and was expressing an understanding of appellant's "situation" when appellant interjected his own thought that there are "two personalities in me." Building on that LaFavers opined that the better personality could overcome "this other mind that keeps dominating" the body, and that just recognizing and admitting the need for help is "half the battle," so that the "crisis that you are going to have to eventually go through" is "happening now" and appellant ought to think about helping other people and himself; with that LaFavers said, "There's no sense in fighting us or us fighting you or batting our heads any more," and suggested that "we go back to this period when it started here ... and you go ahead and fill me in." Responding, "Okay," appellant began to answer some general questions and shortly more specific ones about past crimes, phrased by LaFavers from a "book of reports" to "refresh" appellant's memory. At last LaFavers requested

appellant "to go back to the girl in Panhandle," the case at bar, and in answer to questions appellant related in detail how he committed the offense. In much the same way appellant described another homicide in Borger. He was then offered a soft drink and a piece of pie and, while waiting for them to be brought, according to the transcription, LaFavers spelled out appellant's name as he began to type in the confession form.

**38.** We note that in trial LaFavers acknowledged making nearly every statement attributed to him by the transcription, taking pains at times to explain his true intent and purpose was other than promising anything, and a properly charged jury found the confession by appellant was "freely and voluntarily made ... without compulsion or persuasion." That finding is also supported by the evidence. Ground of error seventeen, contending otherwise, is overruled.

**39.** As LaFavers explained to appellant before the jury, "I didn't want to, so to speak, lose you at that point, and you to talk about different things, so I would agree with you on points rather than try to agitate you by disagreeing."

remarks by the prosecutor that appellant says presented "a false picture" to the jury [40] and the recanting of their initial impressions of his mental condition by Dr. Wall, the psychologist, and Dr. Pennal, the psychiatrist, as well as the limited examination conducted by Dr. Grigson to base his testimony. "This kind of madness by the court and prosecutor, with extreme attempts to suppress evidence,[41] and paint a false picture to the jury," he argues, "resulted in an illegal sentence [sic] of death to the appellant."

Every record reference cited by appellant has been carefully read and considered against his complaints and argument, and it is our judgment that there is no error in any of this. The jury was made aware of the changed diagnoses and the reasons therefor; it was the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. As judges of a reviewing court we cannot say the jury was misled in performing its exclusive function, to the detriment of appellant. Grounds of error eleven and twelve are overruled.

In another cluster of grounds of error, thirteen, fourteen and fifteen, appel-

lant contends the State did not prove "knowingly" and "intentionally," as alleged in the indictment, and "deliberately," as submitted in special issue one pursuant to Article 37.071(b)(1), V.A.C.C.P. But the thrust of his similar contention in each ground of error is not to an evidentiary insufficiency of his culpable mental states and his deliberateness. Rather, citing V.T.C.A. Penal Code, §§ 8.01 [42] and 19.06,[43] and asserting that the State's testimony about his state of mind was "in violation" of Article 46.02,[44] V.A.C.C.P., appellant would have it that the matter of his sanity at the time of the offense "is still unresolved." With this we do not agree, for with a full exposition of available testimony and documentary evidence before it and properly charged on the issue by the trial court, the jury had to find in order to convict appellant, and patently did find, that his affirmative defense of insanity was not supported by a preponderance of the evidence, a burden that the law imposes on appellant. *Graham v. State*, 566 S.W.2d 941, 943, 948–953 (Tex.Cr.App.1978) is particularly instructive in these respects, and from the record of what the jury heard and saw we are unable to hold this to be one of those rare cases in which the findings by the jury

---

**40.** One part of the "false picture" was introduction of personal items—a pillowcase, towel, and the like—taken from the home of appellant by officers armed with his written consent to search. His objection to their being admitted, also claimed as error in ground ten, is that the officer did not receipt for the items. The contention is utterly without merit. The authority he cites, old Article 18.20, V.A.C.C.P., no longer exists.

**41.** This is probably an allusion to the fact that certain subpoenas obtained by appellant were not served, or at least a return of service was not made. The complaint is made in more detail in ground of error three. However, the trial court, upon learning that the applications for subpoenas were not made until during voir dire, warned appellant that they might be too late, offered to do all possible to see they were served, later directed standby counsel to assist in expediting appearances and generally extended utmost cooperation. The simple fact of the matter is, as the trial court expressly found in the record, that appellant did not exercise due diligence in this respect, see, e. g., *Denny v. State*, 558 S.W.2d 467, 470 (Tex.Cr.App.1977),

nor have the record reflect that the prospective testimony would be material to his defense. This ground of error is overruled as, for much the same reasons, is ground of error four complaining of refusing a continuance on account of the missing witnesses and records. See *Jones v. State*, 501 S.W.2d 677, 679 (Tex.Cr.App.1973).

**42.** Section 8.01 provides that insanity at the time of the offense is an affirmative defense, and it defines "mental disease or defect."

**43.** Section 19.06 dictates that in prosecutions for murder or voluntary manslaughter admissible evidence includes "all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."

**44.** Article 46.02, supra, prescribes procedures for determining and consequences of finding incompetency to stand trial—a question that was answered in the case at bar by unimpeachable pretrial proceedings; see discussion under ground of error nine, *ante*.

on the sanity issue must be overturned, *Graham v. State*, supra, at 953. Grounds of error thirteen, fourteen and fifteen are overruled.

 Citing to us *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), appellant complains in his sixth ground of error that the trial court erred in denying him access to a law library. In the context of a convicted inmate of a state correctional institution, the Supreme Court held that a prisoner's right to access to courts requires provision of an adequate law library *or* adequate assistance of persons trained in the law. Through a layman confined with him in the Potter County Jail, appellant addressed to the trial judge a written request for access to a law library that is dated September 28, 1978 and bears a time-stamp of October 3, 1978. The request was rejected by written order reciting that it was considered on the latter date and denied because the assisting layman "has no standing" in the cause involving appellant.[45] Be that as it may, during this period of time appellant was represented by court-appointed counsel who prepared and filed motions in his behalf, participated in pretrial hearings to the extent appellant, then pondering self-representation, would permit and generally rendered aid and assistance ordinarily expected of a criminal law practitioner. Not until a full pretrial hearing held October 6, 1978, did the trial court determine and order that appellant had waived his right to court-appointed counsel and, concomitantly, would be permitted to defend himself—with such assistance of standby counsel as he desired. Thus, even if the rationale of *Bounds v. Smith*, supra, be applicable to a pretrial detainee in a local jail—and we need not decide that point—still the ruling of the trial court was correct for appellant then had adequate assistance of an attorney trained in the law.

Subsequently appellant was transferred from Potter County to the Travis County Jail; an order directing the Sheriff to do so is dated October 17, 1978, and a paper purportedly executed by appellant in Travis County shows his date of commitment in that jail as October 18, 1978. November 27, 1978, with scheduled voir dire about to commence, appellant moved orally for access to a law library, to which the trial judge responded, "I will have Mr. Hale [standby court-appointed counsel] obtain and we will assist you in obtaining anything that you specifically request ... [and] ... if you don't know exactly what you need but you want him to find what is available on a certain point of law then I will request him to do that research for you and to bring you, either through Xerox copies or through actual books, the items you request."

Appellant did not protest that procedure and now does not contend the program planned by the trial judge was not implemented. Indeed, in arguing under this point he states, "Travis County does have a prison inmate library in the County jail ... [and] it is a full volume library," and that he was aided by the librarian, whose name is given. We perceive no error in the initial ruling by the trial court in Potter County nor the manner of providing access to legal materials in Travis County. Ground of error six is overruled.

 In his seventh ground of error appellant complains that the trial court overruled his objection to what he sees as an attempt by the prosecutor to prejudice venire members by the phraseology of an introductory remark to the law concerning an affirmative defense of insanity. He claims a reoccurrence over his objection "several times," but only directs us to a single incident, examination of the eleventh venire person, Betty Cowie, *viz*:

"[Prosecutor]: The Defendant has exercised another right that any defendant in any criminal case has; he has given notice that intends to claim the defense of insanity as a defense in an effort to be found not guilty of the indictment against him.

---

45. But see *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), holding invalid a statute prohibiting aid from a fellow inmate in the absence of an adequate substitute.

MR. HAWKINS: Judge, I object to that, his quotation that I claim to use the insanity in order to not be found guilty of an offense.

THE COURT: I will overrule the objection." [46]

Not being pointed to pages in the record where, according to appellant, the State similarly addressed five persons who ultimately were seated as jurors, or even their names, for resolution of the problem we will not assume *arguendo* that such is the state of the record.[47] As to them, nothing is presented for review. *Love v. State*, 533 S.W.2d 6, 9–10 (Tex.Cr.App.1975); *Chappell v. State*, 519 S.W.2d 453, 457 (Tex.Cr.App. 1975); *Dabbs v. State*, 507 S.W.2d 567, 569 (Tex.Cr.App.1974); *Reynolds v. State*, 506 S.W.2d 864, 866, 867 (Tex.Cr.App.1974). We may not take venire person Cowie as a typical example, see *Davis v. State*, 529 S.W.2d 547, 548 (Tex.Cr.App.1975), for before being excused for cause she made it plain that even should appellant prove his insanity as defined by law she would still convict him. Thus, as to her at least, appellant was helped, not harmed, by the insinuating phrasing of its question by the State. Ground of error seven is overruled.

The grounds of error presented by appellant do not reveal any error harmful enough to require reversal of his conviction.

The State's motion for rehearing is granted and the judgment is affirmed.

McCORMICK, J., not participating.

---

**46.** During his own examination of Cowie, appellant and she got into an exchange over whether, as appellant would have it, "a violation of the law is not a crime when a person commits it while he is insane;" her thought was that "it is a violation whether you're insane or not." The ensuing verbal flap was calmed when the trial judge pronounced the difficulty "just a problem in semantics." The Court has stated the view expressed by Cowie in strikingly similar terms:

"... Insanity is a defense that excuses a defendant from punishment because of his state of mind at the time of the commission of the act.... It does not mean that the conduct ... does not constitute an offense." *Pesch v. State*, 524 S.W.2d 299, 301 (Tex.Cr. App.1975). As more recently pointed out in *Graham v. State*, supra, at 948, "The purpose of the insanity defense issue is to determine whether the accused should be held responsible for the crime, or whether his mental condition will excuse holding him responsible." We have dwelled on this matter in order to demonstrate the basic misconception that colors appellant's approach to and his analysis of the asserted ground of error.

**47.** The voir dire examination was of thirty three prospective jurors; it consumes one thousand pages in five separate volumes of the record before us. That appellant is able accurately to cite volume, page and line numbers of the record in reference to the Cowie exchange and other transactions about which he complains under the balance of his ground of errors evidences his access to the whole record. Even the mandatory review of conviction in a capital case *does not excuse a failure to comply with* important rules for briefing grounds of error in this Court, e. g., Article 40.09, § 9, that are applicable to an appellant acting pro se as well as one represented by counsel. *Williams v. State*, 549 S.W.2d 183, 186–187 (Tex.Cr.App. 1977).