**Charles RUMBAUGH, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 67999.

Court of Criminal Appeals of Texas, En Banc.

March 3, 1982.

Rehearing Denied April 7, 1982.

Gene Storrs, Amarillo, for appellant.

Danny E. Hill, Dist. Atty., Ken Johnson and Phil Black, Asst. Dist. Attys., Amarillo, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W. C. DAVIS, Judge.

This is an appeal from a conviction for capital murder. Punishment was assessed at death.[1]

The State's first witness, Gerald Bishop, testified that on the morning of April 4, 1975, when he went to the deceased's jewelry store, he found the door to the shop open and the body of Michael Fiorillo on the floor. Later that morning, Lieutenant Gerald Jacobs and his partners, Detective Gainer and Lieutenant Garner, went to an Amarillo address a block and a half from the jewelry store with a warrant for appellant's arrest.[2] As the officers approached the residence, they saw the appellant and his sister, Tara Rumbaugh, leaving the building. The appellant identified himself to the officers as Rex Rumbaugh. The officers asked the appellant for identification and appellant told them it was upstairs. Jacobs followed the appellant up the stairs. About halfway up the stairs, the appellant turned around with a gun pointed at the Lieutenant and said "Freeze". Jacobs testified that he ducked down and drew his pistol. The appellant turned and the officer shot appellant in the hand.

The appellant's confession, which was introduced in evidence, stated in part:

"I came to Amarillo in the first week of April, 1975. On the morning of April the 5th, 1975, which was a Friday, just as it was getting light, I left my sister's apartment. There was no one else awake in the apartment when I left.

I walked around for awhile. I walked down Tenth Street and past a jewelry store named Michael's Jewelry. I looked inside, I saw an old man that had glasses on and a gray or blue suit. There was a key in the inside lock to the door.

I walked around the block. I came back. I walked into the door. Right in front of the door is a display case and an aisle leading to the back.

I walked around the display case and the old man came up from the back. He said, 'What can I do for you?' I pulled out a .25 caliber pistol from my coat pocket and I said, 'Just remember, your insurance can give you your money back, but they can't give you your life back.'

I then said, 'Bag up the money.' The old man said that the money was in the safe up front. I told him to open it up. He took a long time to open it. I put the pistol to his head and said, 'Hurry your ass up.'

He opened it and pulled a little metal box out. I told him to set it down. I looked in the safe and saw some watches and I told him to bring them out. He put them on the floor. I said, 'Okay, go back there,' indicating the shop area.

He walked through a doorway and reached to his left on top of a safe and there was a gun in a white money bag. He pulled it out, and when I saw this, I grabbed him and pulled him to the floor.

He dropped the pistol and he grabbed for it again. I put the gun near his head and shot. He fell down and I said, 'You dumb son-of-a-bitch.'

The old man started to get up again, and I shot him again. He fell again and I figured he was dead. I grabbed his pistol and stuck it back in the bag and stuck the bag under my arm. I walked up front and got the money out of the tray. I took only the bills and left the change.

I walked out the door and went back to the apartment. When I got back to the apartment, everyone was still asleep. I stashed everything and went into the living room and turned on the radio and I smoked some weed.

The rest of the house started to wake up. I sat there for awhile and didn't hear anything. I went and got the money bag and the pistol. The money bag had a box of shells and the pistol.

---

1. Appellant's first conviction for this offense was reversed by this Court in *Rumbaugh v. State*, 589 S.W.2d 414 (Tex.Cr.App.1979).

2. The warrant was for an offense unrelated to the instant offense.

I took a pocket knife and cut the money bag up and put the pieces in a sack. I took the cardboard box with the shells in it and burned it. I took a piece of sandpaper and sanded off the inscription on the gun.

The inscription read 'To Mike, Clarence and Curly, December '58.'

I then changed clothes. I stuck the pistol that I had gotten from the old man in my pants. I put the gun up that I had used. I put my clothes in a sack."

Jacobs testified that he retrieved the gun from appellant, a .38 Smith and Wesson pistol. The inscription on the side plate read "To Mike", but the rest of the inscription had been sanded off. It was established by other witnesses that the deceased owned a gun which was inscribed, "To Mike" with the names of the persons that had given it to him.

■ Appellant contends in ground of error one that the trial court erred in denying his "Motion to Sequester Veniremen". The written motion which appears in the record requested that all prospective jurors be sequestered until excused from service by the court. The jury was selected after ten days of voir dire examination. Defense attorneys again requested that the selected jury be sequestered. The trial court stated that he shared defense counsel's concern about pre-trial and in-trial publicity; however, he stated that he would wait until the following Monday to decide whether or not to sequester the jurors.

On Monday, April 28, 1980 the jury was sworn and instructions were repeated. No mention was made concerning sequestration of the jury; however, as the judge was cautioning the jury before dismissing them for lunch, he stated, "Now, insofar as sequestering you at night is concerned, I have decided that that would not be necessary. I'm not concerned about the twelve of you all doing something out of line." There were no objections to the trial court's decision.

Art. 35.23, Vernon's Ann.C.C.P. provides that when jurors have been sworn in a felony case, it is within the trial court's discretion to permit jurors to separate until the court has given its charge to the jury.

The record reflects that the jurors were frequently admonished by the court. The record does not show any violation of these admonishments. *Brantley v. State*, 522 S.W.2d 519 (Tex.Cr.App.1975). No abuse of discretion has been shown. The contention is overruled.

In ground of error two, appellant contends that the trial court erred in failing to grant his motion to suppress evidentiary items seized as a result of an illegal search. A pre-trial hearing was held on the motion to suppress, wherein Captain Kenneth Kahnert testified that on April 4, 1975, he was dispatched to an Amarillo residence to investigate a shooting involving Lieutenant Jacobs. Fahnert testified that he searched the upper floor of the residence after he received permission to do so from appellant's sister Cynthia Rumbaugh, who had told him she rented the apartment. Fahnert stated that he requested permission to search the apartment because after investigating the shooting incident, he suspected the appellant of being a suspect in the instant offense. Fahnert stated that Cynthia Rumbaugh twice gave him permission to search the apartment, once in the presence of a reporter. However, Fahnert stated that he did not have a written consent form with him at the time.

Detective William Gainer testified that he heard "the girl"[3] tell Captain Fahnert, "You can go ahead and search the apartment, there's nothing in it." Gainer also stated that the apartment manager told him that the apartment was rented to Cynthia Rumbaugh. The detective stated that he observed in the apartment what appeared to be marihuana floating in the toilet and sandpaper that had some "metal or foreign matter in it."

3. On cross-examination, Gainer said that the girl who gave her consent was not the girl he had met in front of the house with appellant, but the one who had been in the apartment.

Other witnesses had testified that Tara Rumbaugh was the sister with appellant when he was confronted by police.

Detective Shelby Vitatoe testified that he assisted in the search of Cynthia Rumbaugh's apartment. Vitatoe stated that he overheard Fahnert obtain permission from Cynthia Rumbaugh to search the apartment. Vitatoe recalled that a jewelry bag, two pistols, and a bank bag cut into small pieces were recovered in the search.

The appellant testified that there were two apartments upstairs in the building. He said his sisters lived in the apartments and that "Sometimes they would both stay in one; sometimes one would stay in one and one would stay in the other one." Neither sister testified at the hearing or at the trial.

 It is the right of every citizen to be secure in his home from warrantless searches; however, one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *Nastu v. State*, 589 S.W.2d 434 (Tex. Cr.App.1979). Before consent can be effective, the prosecution must prove by clear and convincing evidence that the consent was given freely and voluntarily. Whether consent to search was voluntary is a question of fact to be determined from the totality of the circumstances. *Brem v. State*, 571 S.W.2d 314 (Tex.Cr.App.1978); *Rice v. State*, 548 S.W.2d 725 (Tex.Cr.App. 1977). Under the circumstances, we conclude that consent by the occupant of the apartment was given freely and voluntarily. The contention is overruled.

Thirdly, appellant contends the trial court erred in failing to grant his motion to suppress the confession. Appellant argues that the State did not prove that appellant was given his *Miranda* warnings prior to interrogation or that the statement was given voluntarily. Lt. Gerald Jacobs testified that after the shooting, he took custody of the appellant, searched him for weapons and read him his rights. At that point, the ambulance arrived and Jacobs rode with appellant to the hospital. Jacobs stated that the next time he saw the appellant was April 6 at the police station. Jacobs said he just wanted to talk to him because "It was

the first person I ever shot, and I wanted to carry on a conversation with him..." During their conversation the appellant wanted to talk to his brother, Rex, who was being held in City Jail. After the appellant spoke with his brother, he gave the Lieutenant a statement. Jacobs stated that he did repeat the constitutional warnings to appellant, but he could not remember if it was at the beginning of the conversation or during the conversation.

The top of the written statement contains typed recitations of the *Miranda* warnings. Jacobs stated that the appellant indicated that he could read and write the English language. Appellant appeared alert; he did not appear intoxicated. Jacobs stated that after the appellant read the statement, he directed Jacobs to make some corrections, which appellant initialed. Jacobs stated that he did not coerce or threaten appellant or promise him anything in exchange for his statement.

The appellant testified that he did not remember being given any constitutional warnings at the scene of the shooting or at the hospital. Prior to his release from the hospital, he stated he was given an injection. He said, regarding the time he gave the statement, "I wasn't my normal self ... But, yes, I knew I was there." Appellant denied reading the constitutional rights at the top of the statement. The appellant also said he was promised that members of his family would receive favorable treatment if he gave a statement. He said he would not have given the statement if not for those promises.

The trial court, in its findings of fact and conclusions of law, found that appellant was given his constitutional warnings in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The court further found that no promises or inducements were made to appellant to coerce his statement and that appellant was not under the influence of narcotics to the extent that his ability to knowingly and voluntarily waive his rights was impaired. The court concluded that the confession was given voluntarily in ac-

cordance with Art. 38.22, Vernon's Ann.C. C.P.

The trial judge, at the hearing on the voluntariness of the confession, is the sole judge of the credibility of the witnesses. The trial court heard conflicting evidence, and believed the testimony of Officer Jacobs and disbelieved that of appellant. See *Moon v. State*, 607 S.W.2d 569 (Tex.Cr. App.1980). The court's finding that the confession was voluntarily given is well supported by the evidence. *Hawkins v. State*, 613 S.W.2d 720 (Tex.Cr.App.1981); *Moon v. State*, supra. The contention is overruled.

In ground of error four appellant contends it was error to allow evidence of appellant's escape from jail eight months after Michael Fiorillo's murder.

Over objection, Deputy Sheriff Jim Hines testified that on December 7, 1975, he was dispensing medicine to inmates in the city jail when he discovered that the cell occupied by appellant, Roger Barrett and Michael Sutton was empty. Hines discovered that a hole, approximately one foot square, had been cut through ¼ inch of steel plate and a couple of metal bars. A rope made from plaited blankets hung outside the seventh story window.

Appellant argues that although evidence of escape is admissible on the issue of an accused's guilt, the eight month period which elapsed between the arrest and the escape, as well as the fact that appellant had other charges pending against him in San Angelo, rendered the evidence inadmissible.

Evidence of escape from custody or flight to avoid arrest is generally held admissible on the issue of guilt. *McWherter v. State*, 607 S.W.2d 531 (Tex.Cr.App.1980). In *Wockenfuss v. State*, 521 S.W.2d 630 (Tex.Cr.App.1975) the defendant contended it was error to admit evidence of his bail jumping. Citing *Hodge v. State*, 506 S.W.2d 870 (Tex.Cr.App.1974), the Court stated:

"[T]o support admission of evidence of escape from custody and flight, it must

appear that the escape and flight has some legal relevance to the offense under prosecution... In order to have such evidence excluded, the burden then shifts to the defendant to show affirmatively that the escape and flight is directly connected to some other transaction and further show that it is not connected with the offense on trial."

The Court also cited *Damron v. State*, 58 Tex.Cr.R. 255, 125 S.W. 396 (1910), wherein the defendant showed, by bill of exception, he had not escaped for the crime charged, but for another offense. "The Court noted that if the escape was in relation to more than one offense it was admissible to all rather than none..." *Wockenfuss v. State*, supra.

The State in the instant offense established that the appellant escaped from custody while awaiting his trial on a charge of capital murder. Absent showing by appellant that escape was related to circumstances unrelated to the charged offense, evidence of escape is admissible. *Wockenfuss v. State*, supra. The contention is overruled.

Keith Randall Pherigo's testimony forms the basis of appellant's complaint in ground of error five. The Department of Public Safety trooper testified that on December 8, 1975 he noticed a car that was driving well under the speed limit. The car's license plate was loose. Pherigo turned and followed the car; the car turned off the highway into an antique clock shop's parking lot. Pherigo continued down the highway, then turned around. As he was driving back, he saw the suspect car "back out of the parking lot and hit a long wooden pole in the parking lot." Then as the car "took off back toward the highway, the man inside the building come [sic] running out like he was trying to stop them." Pherigo then pulled the car over. Roger Barrett was the driver of the car. A girl was in the passenger seat; Michael Sutton and Charles Rumbaugh were in the back. The officer told Barrett he would have to take him before a judge because he was driving without a license. The officer testified "I ad-

vised [Barrett] that it would be necessary for me to take him before a judge at that time, and that the other people in the other car could follow us to the courthouse." At the hearing, Pherigo testified:

"Q. And if Mr. Rumbaugh had tried to leave, you would have restrained him, wouldn't you?

A. Probably.

Q. So then you told Mr. Rumbaugh and the other people to follow you to the courthouse, correct?

A. I told them they could if they wanted to."

When the two cars arrived at the courthouse parking lot, approximately three miles from the spot where they were stopped, the report came back that the plates on the car Pherigo had stopped did not match the car. The female passenger told the officer the car belonged to her. The officer testified:

"At that point, I believed that the car was possibly stolen, and I didn't want to just take Mr. Barrett in whom I had arrested for driving without a driver's license and the woman who I had advised then that she would be charged with displaying a fictitious license plate.

I decided to go ahead and get the other two males that was [sic] in the car, and all five of us together to go into the courthouse."

Pherigo said he was walking behind the group toward the courthouse door when the group stopped. " . . . I motioned with my hand for them to go ahead and go downstairs. At that point, the next thing I knew I had a knife at my throat and one of the males was telling me that if I moved or screamed, he was going to cut my throat." All three men then jumped the officer; someone took the officer's gun. Pherigo testified that he heard a voice, which he later recognized as appellant's, saying, "Kill him, kill him. Shoot him."

█ Appellant maintains that evidence of his conduct and statements is inadmissible because it was obtained as the result of an illegal arrest. He argues that the stop of the automobile was based solely on an inarticulate hunch and that the detention of appellant and the other individuals for a period of fifteen to twenty minutes falls short of compliance with Article 14.01, Vernon's Ann.C.C.P. What the appellant ignores is that he was not the person who was detained and arrested. When Pherigo stopped the car, he had Barrett, the driver of the car, return with him to the patrol car. During the hearing on the motion to suppress, Pherigo was asked, " . . . and if Mr. Rumbaugh had tried to leave, you would have restrained him wouldn't you?" The officer responded "Probably." There was no indication that the appellant ever tried to leave or was detained by the officer. In fact, the officer testified he told the others in the car that they could follow him and Barrett to the courthouse *if* they wanted to.

In *Galitz v. State*, 617 S.W.2d 949 (Tex. Cr.App.1981), the defendant complied with police officers' request to step outside a bar and talk to them. In overruling defendant's contention, it was stated:

"It is only when a person chooses not to be questioned, or remains in submission to a show of force, that the officer's insistence on questioning that person becomes a 'seizure' subject to the constraints of the Fourth Amendment."

In this case, as in *Galitz*, the evidence reflects no submission on the part of appellant to a show of force or authority which left him no choice. The appellant is without standing to challenge the arrest of Barrett. Cf. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *U.S. v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980).

As stated in *McWherter v. State*, supra: "Evidence of escape from custody or flight to avoid arrest is generally held admissible on the issue of guilt. *Hunter v. State*, 530 S.W.2d 573 (Tex.Cr.App. 1975), and cases there cited. It is also relevant to show the efforts made to locate or apprehend the accused, his pursuit and capture, including his resistance to arrest when overtaken, even though this may also prove the commission of another crime."

The evidence was properly admitted. The contention is overruled.

In ground of error six, appellant maintains that the testimony of Frank Carter was erroneously admitted as it was obtained as a result of an illegal arrest. The contention is without merit.

At the punishment phase of the trial, Lieutenant Frank Carter testified that on March 28, 1975, he went to the Roosevelt Hotel in connection with his investigation of an armed robbery.[4] The Lieutenant saw Rumbaugh get out of a cab, carrying a sack. Carter said "Hello, Chucky. What do you have in the sack?" "When I asked him that, he said, 'Nothing,' and he just kind of fell back and the next thing I know he had a revolver sticking in my stomach." Carter dived behind a car. He heard two shots fired and saw that his partner, Detective Zuniga, had drawn his revolver. The appellant was able to escape. The officer observed the contents of the bag appellant had been carrying which were strewn on the sidewalk and found clothing which matched the description of the clothes worn by the robber that Carter had been seeking.

■■■ It is the officer's testimony of what transpired which appellant maintains should be suppressed. The initial question presented, though, is whether or not a "seizure" of appellant occurred. The appellant argues that there was insufficient probable cause for the detention. As this Court stated in *Galitz*, supra, quoting from *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968):

> "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent [an objective and particularized suspicion that a particular person is engaged in specific criminal activity] the person approached may not be detained or frisked but may refuse to cooperate and go on his way." (footnote omitted).

Contrary to appellant's assertion, there is no evidence that appellant was arrested;

rather, the officer asked appellant a question to which the appellant responded by pulling a gun on the officer. As this Court has previously held, proof of unadjudicated extraneous offenses at the punishment phase of a capital murder case is admissible. *Williams v. State*, 622 S.W.2d 116 (1981); *Garcia v. State*, 581 S.W.2d 168 (Tex.Cr. App.1979). The contention is overruled.

■■■ In ground of error seven, appellant contends it was error for the trial court to refuse to admit a videotape of an interview between appellant and a reporter which was conducted on August 31, 1978, while appellant was on death row after his first conviction for this offense. After the trial court refused admission of the videotape, the defense, by way of bill of exception, called the reporter to the stand. The reporter testified that the interview did occur and that the videotape accurately portrayed what occurred. There is nothing whatsoever which indicates how this exhibit would be relevant to any issues at the punishment phase of the trial. The videotape does not appear in the record. Nothing is presented for review. See *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App.1978).

■■■ Next, appellant urges that the evidence is insufficient on special issue number one, the "deliberateness question." Art. 37.071(b)(1), Vernon's Ann.C.C.P. Appellant's entire argument in support of this assertion is,

> "Article 37.071(3)(c), requires that the State shall prove the issue of a Defendant's deliberateness concerning his act beyond a reasonable doubt. Article 37.-071(3)(c), Vernon's Ann.C.C.P. Appellant would submit that the evidence presented by the State in this cause falls far short of being sufficient to sustain the jury's answer of 'Yes' to the issue of deliberateness beyond a reasonable doubt."

As recited in appellant's confession,

> "[The deceased] pulled [a pistol] out, and when I saw this, I grabbed him and pulled him to the floor.

---

**4.** The witness testifying before Lieutenant Carter identified the appellant, without objection,

as the perpetrator of this robbery.

He dropped the pistol and he grabbed for it again. I put the gun near his head and shot. He fell down and I said, 'You dumb son-of-a-bitch.

The old man started to get up again, and I shot him again. He fell again and I figured he was dead."

We find the evidence sufficient to sustain the jury's verdict. See *Milton v. State*, 599 S.W.2d 824 (Tex.Cr.App.1980). The contention is overruled.

▪ Appellant argues in ground of error nine that the trial court erred in allowing the admission of a photograph of the deceased, taken prior to autopsy. Appellant argues initially that this Court should abandon the rules set out in *Martin v. State*, 475 S.W.2d 265 (Tex.Cr.App.1972). This we decline to do. The photograph which depicted the deceased, and the wound he suffered was not gruesome and inflammatory so as to outweigh its probative value. *Milton v. State*, supra; *Martin v. State*, supra. The contention is overruled.

▪ In ground of error ten, appellant maintains the trial court erred in refusing to grant a mistrial when the prosecutor, during final argument, commented on appellant's failure to testify. The complained-of argument is as follows:

"Now, another thing advanced that I heard was 'Well, he didn't kill Jerry Jacobs.' He didn't give up his gun, either, until he was shot in his arm. Is that altogether a reasonable sort of thing to do? And I don't see how anybody can call that plain vanilla, any more than they can compare these proceedings to something under Hitler. And I sure don't think that it's wrong for this jury to see and hear what the Defendant in the case did."

We find that the argument was proper as a response to defense argument. Defense counsel, in response to the State's argument which detailed the sequence of offenses committed by appellant, argued:

"If you have listened to the very strident argument of Mr. Hughes, how much of his argument was devoted solely to the murder case of Mr. Fiorillo? Maybe three minutes. A very small portion of what you have heard in argument and what you have heard in this courtroom the last few days, since Monday, has been concerned with what I would call a plain murder case of Mr. Fiorillo.

* * * * * *

Now, Hitler had that same theory; he decided that there were whole classes of people that he could do away with, he decided if someone was suffering from a mental illness, we castrated them or put them to death, or if they were unacceptable. The problem with that theory is that you have to rely on some man like Temple Elliott to make that decision.

* * * * * *

If Tom Curtis can take a plain vanilla robbery-murder that shouldn't have happened, and I'm sorry, but I can't bring him back, if he can scare you all into turning your mind off and forgetting your oath and finding a crazy kid guilty of capital murder, then you know—I don't know."

We do not perceive the statement by the prosecutor to be an improper comment on the failure of appellant to testify.

▪ Finally, by way of a supplemental ground of error, appellant argues that the admission of testimony from a psychiatrist and a psychologist at the guilt stage of the trial constituted error as enunciated in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). Appellant states that although the statement of facts was not before him, he "generally recall[ed] the testimony of both as being a very positive opinion on the part of each that based on their examinations of appellant he would probably commit future violent acts, and the specific statement of Dr. Elliot that appellant should be killed." This assertion is devoid of merit. *Estelle v. Smith*, supra, is inapplicable here. The record reflects that at the guilt stage, the defense, in an effort to establish an insanity defense, introduced testimony from a psychiatrist, a psychologist and a couple of social workers. These witnesses presented testimony that

appellant had been diagnosed as being mentally ill, prior to the occurrence of the instant offense.

In rebuttal the State presented testimony from two psychiatrists and a psychologist that appellant had no organic brain damage, but was suffering from an antisocial personality. The last two witnesses, a psychiatrist and a psychologist, had examined appellant while he was in jail for the instant offense. The examination was made at the request of defense counsel and in defense counsel's presence. Neither witness testified that appellant would be a continuing threat to society. Regarding the statement alluded to in appellant's brief, the record reflects that on re-cross examination of one State's witness, defense counsel asked:

"Q. What do you think we ought to do with him, just kill him, Doctor?

A. That's a hard question.

Q. Yes, sir.

A. But I would say yes."

The contention is overruled.

We have considered appellant's pro se contentions and have addressed them in context with the above grounds of error.

The judgment is affirmed.

ROBERTS and TEAGUE, JJ., concur in the result.

CLINTON, Judge, concurring.

That evidence of escape tendered by the prosecution was relevant under the circumstances does not necessarily mean it was admissible. The various and varied views expressed by members of a divided Court in *Hodge v. State*, 506 S.W.2d 870 (Tex.Cr. App.1973–1974) indicated that the real problem in such case is the matter of admissibility. I am enough inclined to agree that the trial court properly admitted the testimony here, but I am troubled that the Court seems in the past to have turned burden of producing testimony into a burden of persuasion,[1] and created a procedural difficulty as to admissibility of evidence of escape that is not addressed today.

In *Hodge v. State*, supra, the opinion on rehearing states:

"... In order to have such evidence *excluded*, the *burden* then *shifts to the defendant* to show *affirmatively* that the escape and flight is directly connected to some other transaction and further show that it is not connected with the offense on trial." *Id.*, at 873.[2]

I take it that some kind of hearing outside the presence of the jury is contemplated to resolve the question of admissibility, although of that one is not certain from a close reading of the *Hodge* opinion on rehearing. Thus, it was further written:

"... If the defendant offers evidence that the escape and flight may have sprung from some other cause, but its connection to the offense on trial remains a logical one, the evidence would still be admissible, *the defensive evidence going only to the weight of the evidence.*" *Id.*, at 873.

Since weight of the evidence is a matter for the jury, the supposition in *Hodge* must be that "defensive evidence" is to be adduced in front of the jury. But see the contrary suggestion a year later in *Wockenfuss v. State*, 521 S.W.2d 630, 632[3] (Tex.Cr.App. 1975).

The opinion of the Court in the instant cause concludes on this point that, given the State established appellant escaped from custody while awaiting trial on the charge in this cause, "[a]bsent showing by appellant that escape was related to circumstanc-

1. See generally Ray, Law of Evidence §§ 41–47, 1 Texas Practice 47 ff.

2. All emphasis is mine unless otherwise indicated.

3. "An issue could have been raised in the present case; for example, if appellant had taken the stand outside the presence of the jury for the limited purpose of testifying that the flight occurred because of circumstances surrounding the prior rape conviction or else those relating to another currently pending charge, rather than the present offense. *Absent such a showing* ... evidence of flight is *admissible* as to all of the offenses."

es unrelated to the charged offense, evidence of escape is admissible," citing *Wockenfuss*.[4] As already indicated, *Wockenfuss* suggested how an *issue* regarding admissibility of evidence of escape could be *raised*, and if this Court is reiterating that suggestion we would edify the bench and the bar by saying so, and also by clarifying the uncertainty in this respect one may sense from *Hodge*. Once that is done we could then sort out the respective burdens imposed on the parties.

Still, I concur in overruling the fourth ground of error and join in the judgment of the Court.

---

**4.** In *Wockenfuss* the Court applied the reasoning in *Damron v. State*, 58 Tex.Cr.R. 255, 125 S.W. 396 (1910). Damron took the stand in his own defense and while being crossexamined was compelled to testify "as to other charges of theft and flight," *ibid.* However, apparently he was not allowed to tell the jury that which was incorporated in a bill of exception—that he "had not sought to escape arrest for the crime here involved..." Thus, the privilege against self-incrimination was not implicated in *Damron*; though it looms large in some of the later cases and in the one at bar, its implications are not taken into account.