COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| SAMUEL BENITEZ, | | No. 08-09-00034-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | Criminal District Court No. 1 |
| | § | |
| THE STATE OF TEXAS, | | of Dallas County, Texas |
| | § | |
| Appellee. | | (TC # F-0856598-H) |
| | § | |

## **O P I N I O N**

Samuel Benitez was charged by indictment for the offense of murder. The jury found him guilty and assessed punishment at confinement for life in the Institutional Division of the Texas Department Criminal Justice. For the reasons that follow, we affirm the judgment of the trial court.

## FACTUAL BACKGROUND

In 2008 Alma Avalos, her sister Jesenia Avalos, Jenny Patricia "Patty" Abrego, and Marina "Lety" Garcia worked as waitresses at the Metropolis nightclub located at the intersection of Denton Road and Webb Chapel in Dallas, Texas. At the club, customers could pay for drinks for the waitresses to sit and drink with them. The victim, Augustine Plancarte, was known as "Angel" and frequented the club. Jesenia and Angel had a personal relationship as well and lived together. Appellant, known by the girls as "El Cocho," and his friend "El Compita" were also customers at Metropolis. Patty testified that Appellant told her that Compita was his worker or his bodyguard and that Compita would do whatever he told him. There was also testimony that both Angel and Appellant sold drugs.

Angel Plancarte was murdered on June 4, 2008. Alma testified that in the days preceding

Angel's death, Appellant offered her $40,000 to take a person she "more or less" thought was Angel to a hotel. Jesenia testified that Appellant tried to get her to call Angel for him on June 1 or 2. Appellant told her that Angel owed him money and would not pay him. When Jesenia told Angel that Appellant was looking for him and wanted his money, Angel told her not to worry about his problems. Marina testified that on June 3, Appellant mentioned to her that Angel owed him some money and that he would find a way to collect it.

Jesenia testified that on June 4, Appellant, Compita, and a woman named Lupe went to Metropolis. Appellant told Jesenia that he was desperate about not getting paid and that he was going to collect the money one way or another. Appellant bought drinks for Jesenia, Marina, Janet, and Patty. He became upset when Janet went to sit with some other men. Appellant went outside, and when he came back he showed the girls that he had a gun with a black grip. Patty and Marina were scared and Patty told the disc jockey that Appellant had a gun. After Patty reported the gun, Appellant and Compita left the club.

Jesenia, Patty, and Marina saw Appellant in the parking lot of the club at approximately 4 a.m. He was driving a wine-colored Jeep Cherokee and Compita was in the passenger seat. Marina saw a gun between Appellant's legs as he asked the girls where they were going. Appellant asked who had reported the gun and then accused Jesenia of doing so. Appellant then invited the girls to a twenty-four hour bar and restaurant called Lago Mexico, but the girls declined the invitation. Jesenia, Patty, and Marina testified that Appellant followed them for four or five minutes after leaving the club and then turned onto the road leading to Lago Mexico. Jesenia testified that when she arrived home, she saw Angel. Angel then told her that he was going to do something and that he would be back.

Rogelio Portillo testified that he was working security at Lago Mexico on June 4, 2008, when

he saw two cars pull into the parking lot at about 5 a.m. The first vehicle, a Jeep Cherokee, backed into a parking space; the other vehicle, a Suburban, parked perpendicular to the front of the Jeep. The passenger, a man with a bald head, got out of the Jeep but did not approach the other vehicle. Rogelio saw the driver of the Jeep, who he described as an older man with a thick mustache, approach the Suburban and get inside the front passenger seat of the vehicle. After he saw the driver of the Jeep get into the Suburban, Rogelio went back inside Lago Mexico. Less than five minutes after the vehicles arrived, he heard gunshots outside.

Rogelio headed back towards the parking lot but stopped outside the second set of doors when he saw the two men from the Jeep running in the parking lot. The older man ran around the back of the Suburban and had his hand up. He threw the keys to the younger man, who ran to the driver's side of the Jeep. The Suburban moved slowly "by itself" out of the way of the Jeep and stopped by itself, and the Jeep drove away. Portillo then went back inside Lago Mexico and called 9-1-1 to report the gunshots.

Officer Brandon Innes of the Dallas Police Department was the first officer to respond to the scene. Innes saw the victim slumped over in the driver's seat of the Suburban with his foot on the brake pedal. The Suburban was still in gear to drive.

Detective Richard Dodge of the police department's physical evidence section arrived at the scene to photograph and collect evidence. He observed that the driver's side window of the Suburban had been shot out, the rear window had also been shot, there were bullet strikes on the back left side of the vehicle, and there was a bullet hole in the headrest. Detective Dodge collected a live 9 millimeter cartridge, two green beer bottles, a bullet that fell onto the sheet when the victim was removed from the Suburban, and some drugs and a revolver from the victim's pocket. The revolver, which could hold five cartridges, had five unfired cartridges in it.

The lead homicide detective on this shooting was Dallas Police Detective Eduardo Ibarra. Detective Ibarra testified that when his team first arrived on the scene, the medical examiner field agent found a Mexican consulate identification card under the name of Carlos Andrade, so they believed that this was the deceased's name. After an investigation of the fingerprint data base (AFIS), they determined that Carlos Adrade was an alias and that the deceased's true name was Augustine Plancarte, "Angel." Officers found five cell phones registered to Angel, and after reviewing the phone records, the officers contacted some of the individuals whom Angel had phoned. They spoke to Janet, who put them in contact with Jesenia and the other girls.

Detective Ibarra testified that during the course of his investigation, he learned that Angel had some problems with an individual nicknamed "Cocho." The investigators traced Cocho first to a Francisco Ibarra, whose name on a lease agreement was Daniel Reyes, who ultimately was determined to be Appellant. Detective Ibarra developed a six-person photo lineup consisting of photographs of Appellant and men with similar physical characteristics. Jesenia identified Appellant from the lineup without hesitation, and Lety and the rest of the girls also identified him. Detective Ibarra also determined that there had been a series of phone calls between Angel and Appellant on June 4, 2008, including a call from Appellant to Angel at 4:14 a.m. Based on this information, Detective Ibarra obtained an arrest warrant for Appellant. Members of fugitive unit, including Detective Jason Kennedy, arrested Appellant after a short foot chase on June 12, 2008.

Detective Ibarra conducted a videotaped interview with Appellant after his arrest. During the interview, Appellant told multiple versions of the events on June 4, 2008. Initially, he said that he was at Lago Mexico alone and went inside to drink a beer. He claimed that he was waiting to talk to Angel when a guy came "out of nowhere" and shot Angel. Appellant next said that "he was put up to this, that his life was threatened, and that some associates of his had sent this guy to do this to

Angel," but denied any involvement. Appellant's third version of the shooting was that he drove up with Compita and that, while he was talking to Angel, Compita went around the Suburban and shot Angel. Appellant told the detective that his job was to lure Angel to the location. Also during the interview, Appellant provided a buccal swab and told the officers where they could locate Compita.

The detectives identified Compita as Alfredo Diaz, and the female witnesses all identified him as Compita from photo lineups. Telephone records did not reveal any calls between Angel and Compita. (4 RR 22-23). After his arrest, Compita requested an attorney and was not interviewed. Detective John Palmer obtained a search warrant and consent from Compita's landlord to search the bedroom Compita rented. The officers seized a 38 Special revolver, which was later determined to be the murder weapon, and a box of ammunition from Compita's room. Officers later recovered a letter from Compita to his landlord which said, "Please destroy the gun that's in my room."

Andra Lewis-Krick, a crime scene analyst with the Dallas Police Department, testified that she analyzed, photographed, and collected forensic evidence from the Suburban in which Angel died. Lewis-Krick also processed the vehicle for fingerprints and the collection of DNA. The one identifiable print found on the rearview mirror belonged to Angel. She observed cratering around a bullet defect in the rear driver's side window, which indicated that a bullet traveled through the window from outside the vehicle and was consistent with a bullet traveling through the window and through the front driver's side headrest. She also observed grazing-type marks outside the vehicle. Lewis-Krick testified that she had previously worked at the Southwestern Institute of Forensic Sciences (SWIFS) and was personally familiar with Tara Johnson, a DNA analyst at SWIFS. The DNA testing performed by Johnson did not reveal the presence of Compita's DNA on any of the evidence; a swab collected from the interior of Angel's car indicated a one in seven probability that Appellant was the contributor of the DNA.

Vicki Hall, a trace evidence examiner at SWIFS, testified about the results of gunshot residue (GSR) testing. She identified bullet defects and GSR on two shirts worn by Angel at the time of his death. The GSR surrounding a defect near the right upper back area of the shirts indicated that the gun was fired from a distance of one to five feet. She also found GSR on Angel's hands, indicating that he had fired or handled a firearm or been in close proximity to the discharge of a firearm. Hall testified that there was GSR on the ceiling liner of the vehicle, which indicated that a gun was discharged in the vehicle or that someone possibly stood outside the vehicle and pointed the gun in from the passenger side. She also identified GSR on the front and back of the passenger side seat cover.

Dr. Jill Urban, a forensic pathologist at the Dallas County Medical Examiner's office at SWIFS, testified that she reviewed the results of the autopsy performed on Angel's body by another medical examiner, Dr. Amy Gruszecki. The autopsy revealed that Angel suffered gunshot wounds to the head, the right arm, and the trunk. After initially issuing an autopsy report on July 16, 2008, Dr. Gruszecki amended her report to reflect that the wound to Angel's left chest was an exit wound; the entrance was on the right back. Four of the five gunshot wounds were from right to left; the fifth, which had an irregular entrance, was from the back. Toxicology results revealed the presence of amphetamine and methamphetamine. Dr. Urban testified that Angel died as a result of multiple gunshot wounds.

Charles Clow, a tool mark examiner at SWIFS, testified that he performed testing on the firearms and bullets collected. He determined that the bullets and bullet fragments recovered during the autopsy were fired from the revolver found in Compita's room. He also determined that the unfired 9-millimeter Luger cartridge found at the scene had been cycled through the semiautomatic handgun found in the vehicle at the time of Appellant's arrest.

Appellant moved for a directed verdict, which the trial court denied, but he did not present any evidence during the guilt-innocence phase of trial. The jury found Appellant guilty of murder, and after hearing the testimony of Angel's uncle, sentenced Appellant to life in prison.

## SUFFICIENCY OF THE EVIDENCE

In two issues, Appellant challenges the legal and factual sufficiency of the evidence to support his conviction. He complains that the evidence fails to establish that, either as a primary actor or as a party, he intentionally or knowingly caused Angel's death.

*Standard of Review*

In reviewing the legal sufficiency of evidence, we consider all evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979). We look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007), *quoting Cordova v. State*, 698 S.W.2d 107, 111 (Tex.Crim.App. 1985). We must account for "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper*, 214 S.W.3d at 13, *quoting Jackson*, 443 U.S. at 318-19, 99 S.Ct. 2181.

Appellate courts are constitutionally empowered to review the judgment of the trial court to determine the factual sufficiency of the evidence used to establish the elements of an offense. *Johnson v. State*, 23 S.W.3d 1, 6 (Tex.Crim.App. 2000), *citing Clewis v. State*, 922 S.W.2d 126, 129-30 (Tex.Crim.App. 1996). In examining the factual sufficiency of the elements of the offense, all evidence is viewed in a neutral light, favoring neither party. *Clewis*, 922 S.W.2d at 129. In

performing our review, due deference is given to the fact finder's determinations. *See Johnson*, 23 S.W.3d at 8-9. Evidence may be factually insufficient if it is so weak that it would clearly be wrong and manifestly unjust for the verdict to stand, or "the adverse finding is against the great weight and preponderance of the available evidence." *Johnson*, 23 S.W.3d at 11. The question that must be answered when reviewing factual sufficiency is whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or proof of guilt, although ample if taken alone, is greatly outweighed by contrary proof. *Id* .

Under the first prong of *Johnson*, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the amount of evidence admitted, we would have voted to acquit had we been on the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App. 2006). Under the second prong of *Johnson*, we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of the conflict. *Id*. In order to find that evidence is factually insufficient to support a verdict, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.*

*Elements of the Offense*

A person commits murder if he intentionally or knowingly causes the death of an individual. TEX.PEN.CODE ANN. § 19.02(b)(1)(Vernon 2003). The jury was instructed to find Appellant guilty if it believed beyond a reasonable doubt that Appellant committed the offense by his own conduct or as a party. A person can be criminally responsible as a party to an offense if the offense is committed by his own conduct, by conduct of another for which he is criminally responsible, or both. TEX.PEN.CODE ANN. § 7.01(a)(Vernon 2003). Under Texas law, a person can be criminally

responsible for an offense committed by the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX.PEN.CODE ANN. § 7.02(a)(2).

The evidence must show that, at the time of the offense, the parties were acting together, each contributing some part toward execution of their common purpose. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex.Crim.App. 1994)(op. on reh'g). In determining whether a defendant participated in an offense as a party, the fact finder may examine the events occurring before, during, and after the commission of the offense and may rely on actions of the defendant that show an understanding and common design to commit the offense. *Id. citing Cordova v. State*, 698 S.W.2d 107, 111 (Tex.Crim.App. 1985)); *see Miller v. State*, 83 S.W.3d 308, 314 (Tex.App.--Austin 2002, pet. ref'd).

Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004); *see also Wygal v. State*, 555 S.W.2d 465, 469 (Tex.Crim.App. 1977) (circumstantial evidence may be sufficient to show that one is a party to the offense). Though mere presence at the scene is not enough to sustain a conviction, it is a factor that may be considered in determining whether an appellant was a party to an offense. *Sosa v. State*, 177 S.W.3d 227, 230 (Tex.App.--Houston [1st Dist.] 2005, no pet.); *see Livingston v. State*, 739 S.W.2d 311, 330 (Tex.Crim.App. 1987). Finally, evidence of flight from the scene of the crime is evidence from which an inference of guilt may be drawn. *See, e.g., Foster v. State*, 779 S.W.2d 845, 859 (Tex.Crim.App. 1989); *Rumbaugh v. State*, 629 S.W.2d 747, 752 (Tex.Crim.App. 1982).

*Analysis*

In Point of Error One, Appellant argues the evidence is legally insufficient to support his conviction. We disagree. Taken in the light most favorable to the verdict, the record reflects

evidence of an ongoing dispute between Appellant and Angel. In the days immediately prior to Angel's death, Appellant offered Alma $40,000 to take someone she thought was Angel to a hotel. Appellant tried to get Jesenia to call Angel for him and told her that Angel owed him money. On the day before the murder, Appellant told Marina that Angel owed him money and that he would find a way to collect it. When Appellant, Compita, and Lupe went to Metropolis on the night of the murder, Appellant reiterated to Jesenia that he was desperate and that he was going to collect the money one way or another. Both Marina and Patty saw Appellant with a black-handled gun at Metropolis on the night of Angel's murder, and Marina saw the gun between Appellant's legs in his Jeep outside the club as well.

Rogelio testified that he saw a Jeep Cherokee and a Suburban pull into the parking lot of Lago Mexico on June 4, 2008. He observed the younger, bald-headed passenger stand by the Jeep, while the driver, a man fitting Appellant's description, approach the Suburban and sit in the front seat of the vehicle. After he heard gunshots, Rogelio went back towards the parking lot and saw the two men from the Jeep running in the parking lot. He testified the older man ran around the back of the Suburban and had his hand up; the older man threw the keys to the younger man, who ran to the driver's side of the Jeep and drove out of the parking lot.

The medical examiner testified that four of the gunshot wounds were from right to left and the fifth was from the back. The trace evidence examiner testified the presence of GSR on the ceiling liner of Angel's vehicle indicated that a gun was discharged in the vehicle. Even though the officers recovered the murder weapon from Compita's house with a note to the landlord asking to destroy it, there was enough evidence for the jury to conclude that Appellant shot Angel while he was sitting in the passenger's seat of Angel's vehicle and then gave the murder weapon to Compita. Additionally, a rational jury could have concluded that Appellant directed Compita to kill Angel.

This theory is evidenced by the testimony of Jesenia and Marina that Appellant said he would find a way to collect the money Angel owed him and Patty's testimony that Appellant said that Compita would do whatever Appellant told him.

Appellant admitted to Detective Ibarra that he was present at Lago Mexico during Angel's murder. In fact, Appellant's statement to Detective Ibarra indicated that Appellant was more than merely present. Appellant also told several versions of the events at Lago Mexico and ultimately admitted that his job was to lure Angel to the location. He told Detective Ibarra that he drove to Lago Mexico with Compita and that, while he was talking to Angel, Compita went around the Suburban and shot Angel, which is consistent with Hall's testimony that the GSR could have been deposited on the ceiling liner of Angel's vehicle if someone stood outside the vehicle and pointed a gun from the passenger side. Because we conclude that the evidence is legally sufficient, we overrule Point of Error One.

In Point of Error Two, Appellant challenges the factual sufficiency of the evidence to support his conviction. In determining whether Appellant acted as a party to the offense, the jury could examine the events occurring before, during, and after the commission of the offense and could rely on actions of Appellant that show an understanding and common design to commit the offense. *See Ransom*, 920 S.W.2d at 302. Appellant repeatedly complained that Angel owed him money and that he intended to collect it. He bragged to Patty that Compita would do whatever he told him to do. Rogelio's testimony also demonstrated Appellant's involvement. Rogelio saw a Jeep Cherokee and a Suburban pull into the parking lot of Lago Mexico and that the driver of the Jeep, a man fitting Appellant's description, got into the front passenger's seat of the Suburban while the younger, bald-headed passenger stood by the Jeep. After he heard the gunshots, Rogelio went back towards the parking lot and saw the two men from the Jeep running in the parking lot before quickly driving

away.

The jury could also draw an inference of guilt from Appellant's and Compita's flight from Lago Mexico after the shooting. Appellant also attempted to flee from Detective Kennedy. Appellant told Detective Ibarra several versions of what happened the night of the killing and eventually admitted that his job was to lure Angel to the location. Because the evidence is factually sufficient to support Appellant's conviction, we overrule Point of Error Two.

## CONFRONTATION CLAUSE

In Points of Error Three and Four, Appellant argues that he was deprived of the right to confront and cross-examine two significant witnesses about their analysis and test results which were offered into evidence. He complains that the trial court abused its discretion in admitting (1) the results of DNA testing through a witness who did not perform the testing, and (2) testimony concerning the autopsy from a doctor who did not perform the autopsy. The State responds that Appellant failed to preserve these issues for review because he did not object at trial.

### *Applicable Law*

To preserve a complaint for appellate review, the party must state the grounds for the desired ruling from the trial court "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds [are] apparent from the context . . . ." TEX.R.APP.P. 33.1(a)(1)(A); *Reyna v. State*, 168 S.W.3d 173, 177 (Tex.Crim.App. 2005). This is to give the trial court an opportunity to rule on the defendant's appellate rationale. *Reyna*, 168 S.W.3d at 178. It is also to give the trial court the opportunity to correct the error or remove the basis for the objection. *Reyna*, 168 S.W.3d at 179. The Sixth Amendment right to confront and cross-examine witnesses may also be forfeited if the defendant fails to object. *Deener v. State*, 214 S.W.3d 522, 527 (Tex.App.--Dallas, 2006, pet. ref'd).

Under the Sixth Amendment, the accused has a constitutional right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Supreme Court has held that the confrontation clause bars the admission of out-of-court testimonial statements made by a witness who does not testify unless the witness is unavailable to testify and the defendant has had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Supreme Court recently applied *Crawford* to certificates of analysis from non-testifying laboratory analysts, concluding that the certificates were affidavits containing testimonial statements for the purposes of the Sixth Amendment. *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314 (2009); *see also Cuadros-Fernandez v. State*, No.05-06-01464, 2009 WL 2647890, at *8 (Tex.App.--Dallas 2009, no pet. h.)(not yet designated for publication)(applying *Melendez-Diaz* to objected to error in the admission of a DNA report without testimony from the analyst who performed the testing).

The Austin Court of Appeals has considered whether the failure to object to *Crawford* error waives appellate review of the issue. In *Bunton v. State*, 136 S.W.3d 355, 369 (Tex.App.--Austin 2004, pet. ref'd), the appellant claimed that *Crawford* represented a new and novel constitutional rule such that it would have been futile to object on the basis of the Sixth Amendment's confrontation clause. But the court rejected the argument, holding that "*Crawford* makes clear that the federal constitutional right to confront one's accusers is neither new nor novel." *Id.* at 369. We agree with our sister court that, "We find nothing in *Crawford* that would excuse appellant for failing to make a confrontation claim at trial." *Id*.

*Relevant Facts*

The State presented the testimony of Andra Lewis-Krick, a crime scene analyst, who collected evidence from Angel's car. She previously worked at SWIFS, was personally familiar with

Tara Johnson, a DNA analyst, and had been made aware of the results of Johnson's examination of swabs she submitted for testing. When the State offered Johnson's DNA report during Lewis-Krick's testimony, defense counsel affirmatively stated that he had no objection. Dr. Jill Urban testified about the results of the autopsy which Dr. Amy Gruszecki performed. Appellant failed to lodge a confrontation clause objection to her testimony. We overrule Points of Error Three and Four and affirm the judgment of the trial court.

August 4, 2010

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)